IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| TROY MERRITT | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | NO. 3:17-cv-01372 |
| | ) | |
| MGC SPORTS LLC and 1 DEGREE | ) | JUDGE CAMPBELL |
| SPORTS MANAGEMENT, LLC., | ) | MAGISTRATE JUDGE BROWN |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM**

Pending before the Court are Defendants' Motion for Summary Judgment (Doc. No. 53) and Plaintiff's response (Doc. No. 61); and Plaintiff's Motion for Partial Summary Judgment (Doc. No. 58) and Defendants' response (Doc. No. 65). For the reasons discussed below, Defendants' Motion for Summary Judgment is DENIED, and Plaintiff's Motion for Summary Judgment is DENIED.

**I.   FACTUAL BACKGROUND**

Plaintiff[1] Troy Merritt is a professional golfer living in Meridian, Idaho. (Doc. No. 62 at ¶ 1.) Shortly after he finished college in 2008, Merritt hired Peter Webb as his manager. (Doc. No. 66 at ¶ 1.) Aside from an 18-month period when Webb was subject to a non-compete clause, Peter Webb has been Merritt's manager for his entire golf career. (Doc. No. 61-1 at ¶ 2.) On November 23, 2014, Merritt signed a marketing representation agreement (the

---

[1] Troy Merritt filed the initial complaint seeking a declaratory judgment as to his obligations under a sports management agreement with 1 Degree Sports. 1 Degree Sports and MGC Sports filed a counterclaim. For ease of reference, the Court refers to Mr. Merritt as Plaintiff and 1 Degree and MGC Sports as Defendants throughout.

1

"Agreement") with the agency where Peter Webb was then employed, 1 Degree Sports Management ("1 Degree"). (Doc. No. 33-1; Doc. No. 62 at ¶ 6.)

Through the Agreement, Troy Merritt retained 1 Degree as his "manager and agent" to serve as his "exclusive representative worldwide in negotiating and managing [] income-producing activities on [his] behalf." (Doc. No. 33-1.) The Agreement makes no reference to Peter Webb. As compensation for the services provided by 1 Degree, the Agreement provides that Merritt will pay commissions of varying amounts (12%-20% depending on the category) to 1 Degree for money earned from contracts "negotiated (in full or in part), secured (in full or in part), or managed (in full or in part)" for the contractual term of the opportunities secured by 1 Degree. (*Id*. at 2.1, 2.2, 2.3.) The Agreement further requires that Merritt pay a 15% commission on any income-producing opportunities that were initially negotiated, secured, or managed by 1 Degree but renewed or renegotiated by a third party after the termination of the Agreement. (*Id*. at ¶ 2.3.) This is referred to in the Agreement as a "perpetual fifteen (15%) commission." (*Id*.) The Agreement requires that Merritt pay all amounts owed to 1 Degree within fifteen days of receiving "commissionable income." (*Id*. at ¶ 2.4.)

Between November 23, 2014 and October 31, 2016, 1 Degree negotiated or renewed income-producing contracts on behalf of Merritt with the following companies: Adams, Titleist/FootJoy, TaylorMade, Sligo, California Pizza Kitchen, Acushnet Company, World Fuel Services Corporation, EZ Links / teeoff.com, Galvin Green, MGM Resorts International Operations, Inc., and Wilson Sporting Goods Company. (Doc. No. 62 at ¶¶ 10, 13, 15, 17, 19, 22, 37.) Defendants claim they are owed commission payments on the contracts for Acushnet Company, Wilson Sporting Goods, World Fuel Services Corporation, EZ Links Golf, LLC / TeeOff.com, Galvin Green, and MGM Resorts International Operations, Inc.. (Doc. No. 35 at

¶ 17; Doc. No. 61-1 at 6, 7.) Merritt claims that 1 Degree agreed not to charge commission for the 2017 World Fuel contract because he had already paid a 20% commission on this contract to another sports management agency. (Doc. No. 67 at ¶¶ 6, 7; Doc. No. 56, Ex. M.) In an April 24, 2017 email exchange between Merritt's agent, Peter Webb, and Alan Bullington, CEO of 1 Degree, Bullington said that he recalled discussing World Fuel, but did not recall agreeing to 100% of the commission going to the other sports management agency. (Doc. No. 56, Ex. M.) He stated in the email that he would, nevertheless, not charge Merritt commissions for the World Fuel Contract until 2018. (*Id.*)

1 Degree operated as a sports management company until October 31, 2016. On September 23, 2016, 1 Degree and the law firm McAngus, Goudelock & Courie, LLC created a new company called MGC Sports LLC ("MGC Sports"). (Doc. No. 56-8.) MGC Sports is owned jointly by 1 Degree (49.999%) and the law firm (50.001%). (*Id.*) The newly created company, MGC Sports, took over operations from 1 Degree on November 1, 2016. (Doc. No. 62 at ¶ 24.)[2]

Although 1 Degree continued to exist as a legal entity,[3] it "continued operations solely as 1 Degree through October 31, 2016." (Doc. No. 62 at ¶ 24.) On November 1, 2016, MGC

---

[2] The parties have devoted a significant amount of their briefing to argument over the corporate structure of MGC Sports. The evidence establishes that MGC Sports is a South Carolina corporation that was created on September 23, 2016. Whether MGC Sports is a partnership, as it states in the Operating Agreement (*id.*), or a joint-venture, as asserted by MGC Sports (Doc. No. 55-1 at 2; Doc. No. 55-2 at 2-4), is not determinative of any of the issues in this case.

[3] 1 Degree has provided evidence of its continued corporate existence: Certificate of Corporate Existence from the Secretary of State of Tennessee, dated October 17, 2018; 2017 tax returns for 1 Degree Sports Management LLC; a promissory note held by 1 Degree payable to Franklin Bank and Trust Co. entered into on December 29, 2016, with a maturity date of December 29, 2020; and profits interest agreements between 1 Degree and Matt Cullen Kyle Strongin, and Mario Tiziani dated January 1, 2017. (Doc. No. 56, Ex. P.)

Sports took over payroll for 1 Degree and all employees of 1 Degree became employees of MGC Sports (Doc. No. 66 at ¶ 6.) Essentially, MGC Sports carried on the usual business of 1 Degree. Peter Webb continued to negotiate and manage Troy Merritt's equipment and corporate endorsement deals after November 1, 2016, while he was working for MGC Sports. (Doc. No. 67 at ¶ 5.)

On December 9, 2016, after working as an employee of MGC Sports for about five weeks, Peter Webb resigned. Shortly thereafter, on December 14, 2016, Troy Merritt called Alan Bullington and asked to be released early from the Agreement, so he could continue to work with Peter Webb. (Doc. No. 62 at ¶ 28.) Bullington agreed to release Merritt from the Agreement subject to the post-termination payment obligations set forth in Section 2 of the Agreement. (*Id*. at ¶ 29.) Following the phone conversation, Bullington sent an email to Merritt:

> Per our conversation earlier this morning I am writing to confirm that you would like to terminate your management agreement dated November 23, 2014 ("the Agreement"). While the Agreement is not set to expire until December 31, 2017, I will agree to an effective termination date of December 31, 2016. Above all else, I want you and Courtney to be comfortable with your management situation. I know you and your family have been through an extraordinarily difficult situation with your uncle, and we definitely don't want to cause you or Courtney any additional stress. Your only post termination obligations will be those set forth in Section 2 of the Agreement, and I'm happy to coordinate fulfillment of those obligations with you, Courtney or Peter as payments become due. Just let me know who you would like me to communicate with moving forward. I wish you the best of luck on and off the course and hope your family has a wonderful Christmas. (Doc. No. 62 at ¶ 30; Doc. No. 56, Ex. J.)

Merritt responded to the email the next day: "I do wish to terminate my Management Agreement. We will work in partnership to abide by Section 2 in the Agreement. We can coordinate through Peter Webb as payments come due. Thank you again for everything that you've done for us." (Doc. No. 62 at ¶ 31; Doc. No. 56, Ex. K.)

On January 1, 2017, MGC Sports sent an invoice reflecting certain commissions earned in 2016 to Merritt for $15,800. (Doc. No. 56, Ex. L.) Merritt paid the invoice. (*Id*.; Doc. No. 62 at ¶¶ 32, 33.) On April 13, 2017, MGC Sports invoiced Merritt $1800 for commission on certain payments received in 2017. (Doc. No. 56, ex. N.) Merritt paid the invoice. (*Id*.; Doc. No. 62 at ¶ 35.) On October 10 and November 10, 2017, MGC Sports sent Merritt invoices for $70,425 for commission on payments in 2017. (Doc. 61-1, Exs. A and B.) Merritt has not paid these invoices and disputed the World Fuel charges, as well as the right of MGC Sports to collect payments under the Agreement.

On October 13, 2017, Troy Merritt filed this action alleging breach of contract and requesting a declaratory judgment defining the parties' obligations under the Agreement. Specifically, Merritt asks that the Court declare: (1) MGC Sports cannot enforce the compensation terms of the Agreement because it is not a party to the Agreement; (2) Merritt is excused from performance under the Agreement due to 1 Degree's material breach of the contract when it improperly assigned the Agreement to MGC Sports without written consent; (3) that any assignment of the contract is null and void; (4) that compensation is limited to the term of the Agreement only – December 31, 2017 – and that no compensation by Merritt shall be required beyond the December 31, 2017, date of termination contained in the agreement; (5) that any perpetual compensation obligations in the Agreement are voidable or unenforceable; or (6) that Merritt is not obligated to pay commission to MGC Sports or 1 Degree on the corporate endorsement contract with World Fuel Services. Defendants filed a counterclaim alleging breach of contract, quantum meruit, punitive damages, and requesting attorneys' fees. Defendants further request a declaratory judgment that Merritt is obligated to continue to pay commissions to 1 Degree or MGC Sports.

Defendants moved for summary judgment asking the Court to dismiss Merritt's Amended Complaint and to grant judgment as a matter of law for Defendants as to all claims alleged in Defendants' Counterclaim. Plaintiff filed a motion for partial summary judgment as to the issue of attorneys' fees.

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's claims. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper question of fact. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the trier of fact could reasonably find for the nonmoving party. *Rodgers* 344 F.3d at 595.

In ruling on a motion for summary judgment, "[a] district court is not … obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). In determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely only upon those portions of the verified pleadings, depositions, and answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

### III. ANALYSIS

#### A. Breach of Contract

Plaintiff's Amended Complaint asserts Defendants materially breached the Agreement by assigning the Agreement to MGC Sports without his consent and that this breach excuses his performance under the Agreement. Defendants argue 1 Degree did not breach the Agreement because it did not assign any duties under the Agreement, only the right to receive payment. Defendants filed a counterclaim that Merritt breached the Agreement by not paying required commissions.

##### 1. Assignment of the Agreement to MGC Sports

Defendants do not dispute that 1 Degree assigned the right to received payments under the Agreement to MGC Sports. Defendants claim that although 1 Degree assigned its rights under the contract, it did not delegate any duties. The evidence indicates otherwise. Defendants state that all employees of 1 Degree became employees of MGC Sports on November 1, 2016. (Doc. No. 66 at ¶ 6.) Peter Webb stated that he worked on Merritt's account from November 1, 2016, until his resignation on December 9, 2016. (Webb Dep., Doc. No. 76-1 at 13, 16.) Though 1 Degree continued to exist as a legal entity, the evidence indicates that MGC Sports

7

took over the business operations of 1 Degree. With no evidence to the contrary, the Court finds employees of MGC Sports performed duties for which 1 Degree was contractually obligated. This demonstrates that 1 Degree delegated its duties under the contract to MGC Sports.

### 2. Material Breach of the Agreement by Assignment

The Agreement includes an anti-assignment clause: "[t]his agreement cannot be assigned without prior written consent of both parties." (Agreement ¶ 4.6, Doc. No. 33-1.) Even absent an anti-assignment clause, contracts involving personal skill, trust, or confidence, are not assignable unless the obligor assented to the assignment. *Id*. (citing *Edgewood Lumber Co. v. Hill*, 223 S.W.2d 210, 215 (Tenn. Ct. App. 1949).

However, there is a general policy favoring the right to assign payments so that "[u]nless the circumstances indicate the contrary, a contract term prohibiting assignment of 'the contract' bars only the delegation … of the performance of a duty." *Riley v. Hewlett-Packard Co.*, 36 Fed. Appx. 194, 195-96 (6th Cir. 2002) (quoting Restatement (Second) of Contracts § 322 (1981)). "[A]nti-assignment clauses are construed to mean that duties, not rights to payment, are non-assignable." *Id*.

Moreover, the assignment was effective even if 1 Degree did not notify Merritt of the assignment except through invoices. *See S&M Brands, Inc. v. Summers*, 420 F.Supp.2d 840 (M.D. Tenn. 2006) (holding failure to notify the obligor prior to filing suit is not required.) Accordingly, assignment of the right to payment due under the contract was not prohibited by the anti-assignment clause, nor did failure to give notice affect the validity of the assignment.

Having determined that assignment of payments did not breach the Agreement, the Court turns to the question of delegation of duties. As discussed, the anti-assignment clause in

the agreement and common law regarding the assignability of personal services contracts prohibits delegation of duties under the Agreement without consent. *See Fleet Business Credit*, 2008 WL 2579231 at *5 (citing *Edgewood*, 223 S.W.2d at 215); Restatement (Second) of Contracts § 322 (1981). Accordingly, 1 Degree's delegation of its duties under the Agreement was a breach of contract.

Neither party has presented evidence or argument regarding the materiality of the alleged breach. The distinction between a material and an immaterial breach is not insignificant. A material breach on the part of 1 Degree would relieve Merritt of his performance under the Agreement, while an immaterial breach would allow Merritt to sue for any damages caused, but he would still be bound to continue performance under the contract. Because the parties have not briefed the issue of materiality, the Court cannot determine whether the breach was a material breach.

In summary, on the issue of breach of contract, the Court finds 1 Degree did not breach the Agreement when it assigned the right to payment to MGC Sports; and 1 Degree did breach the Agreement when it delegated duties without consent. The Court cannot determine whether that breach was material. Accordingly, Defendants' motion for summary judgment on their breach of contract counterclaim is DENIED.

**B. Perpetual Payments**

Plaintiff argues that clause 2.3 of the Agreement requiring payment of commission on "renewals or extensions of any income producing opportunities originally negotiated … by 1 Degree" is unenforceable because it is a "perpetual obligation," which are disfavored by Tennessee law. The Court disagrees. Despite the language in the Agreement which refers to a "perpetual fifteen percent (15%) commission payable to 1 Degree," the commission payment

is not, in fact, perpetual. As stated in the agreement, and by nature of commission agreements, the commission is not payable indefinitely, but only for so long as the "income producing opportunities" originally negotiated by 1 Degree are renewed. When Merritt chooses not to renew these opportunities and no longer receives the associated income, the payment obligation will end.

Plaintiff correctly argues that perpetual obligations are disfavored. The rule, however, is one of contract construction – in cases of ambiguity, courts will not construe a term to create a perpetual obligation unless the contract clearly states that is the intention of the parties. *See Open Lake Sporting Club v. Lauderdale Haywood Angling Club*, 511 S.W.3d 494, 501-03 (Tenn. Ct. App. 2015) (reviewing cases).

The case cited by Plaintiff applies this rule of construction. In *Parker v. Union Planters Corp*, the court was required to construe the meaning of the term "following." 203 F. Supp. 2d 888, 901 (W.D. Tenn. 2002). One party argued "following" had no temporal limitation and the other argued "following" meant "immediately following." *Id*. The court employed the rule of construction that cautions against interpreting contracts to provide for perpetual contractual rights "unless the contract clearly states that that is the intention of the parties." *Id*. (citing *William B. Tanner Co., Inc. v. Sparta-Tomah B'casting Co., Inc*., 716 F.2d 1155, 1159 (7th Cir. 1983)). The court held the intent of the parties was not to create a contract with an indefinite term, noting that there was "no clear statement of indefinite duration in this Agreement – merely the indefinite term 'following.'" *Id*.

In contrast with the contract in *Parker*, no term construction is required here. The contract language is clear that the payment obligation extends so long as Merritt receives income from "income producing opportunities" initially negotiated by 1 Degree.

The Court finds the compensation provision clearly evidences the parties' intention to create a payment obligation for so long as Merritt receives income from opportunities originally negotiated by 1 Degree and is, therefore, not an unenforceable perpetual agreement.

### C. World Fuel Commission

Plaintiff argues that Defendants' motion for summary judgment as to the World Fuel commission should be denied because 1 Degree waived its right to commission for this contract. As evidence of waiver, Plaintiff cites an email from Alan Bullington, CEO of 1 Degree, in which Bullington states that he recalled discussing World Fuel, but did not recall agreeing to 100% of the commission going to the other sports management agency, but that he would not charge Merritt commissions for the World Fuel Contract until 2018. (Doc. No. 56, Ex. M.)

Plaintiff has raised a question of fact on this issue, such that summary judgment is not appropriate.

### D. Defendant's Counter-claim for Attorneys' Fees

Plaintiff has moved for summary judgment on Defendants' counterclaim for attorneys' fees under the Agreement. The Agreement states "The prevailing party in any dispute relating to this Agreement shall also be entitled to reimbursement of all attorneys fees and court costs." (Agreement, Doc. No. 1-1.) Plaintiff argues this provision of the agreement is no longer in force because the parties agreed to a novation by which only the Section 2 compensation provisions remained in effect. Defendants claim the parties did not create a novation; they modified the Agreement to change the termination date and left the remainder of the agreement in effect.

A novation is a contract substituting a new obligation for an old one, thereby extinguishing the existing contract. *Lowe v. Smith*, 2016 WL 5210874 *7-8 (Tenn. Ct. App.

2016). "[A] novation differs from a modification of a contract since a modification alters only certain portions of the contract, and leaves the original contract in place, while a novation substitutes a new contract and wholly extinguishes the earlier contract." *Williams v. Hirsch*, 2018 WL 2383612 *5-6 (Tenn. Ct. App. 2018) (quoting 58 AM. JUR. 2D Novation § 2, Westlaw (database updated May 2018)).

The party asserting novation has the burden of proving that all parties had a clear and definite intent to replace the old contract with the new one. *Williams v. Hirsch*, 2018 WL 2383612 *5 (Tenn. Ct. App. 2018). Where there is conflicting evidence, the parties' intent on a possible novation is a question of fact. Lowe, 2016 WL 5210874 at *7 (citing 21 Steven W. Feldman, Contract Law and Practice § 3:43).

Plaintiff submits the emails between himself and Bullington as evidence of the parties' mutual intent to work a novation. The email from Bullington states:

> Per our conversation earlier this morning I am writing to confirm that you would like to terminate your management agreement dated November 23, 2014 ("the Agreement"). While the Agreement is not set to expire until December 31, 2017, I will agree to an effective termination date of December 31, 2016. Above all else, I want you and Courtney to be comfortable with your management situation. I know you and your family have been through an extraordinarily difficult situation with your uncle, and we definitely don't want to cause you or Courtney any additional stress. Your only post termination obligations will be those set forth in Section 2 of the Agreement, and I'm happy to coordinate fulfillment of those obligations with you, Courtney or Peter as payments become due. Just let me know who you would like me to communicate with moving forward. I wish you the best of luck on and off the course and hope your family has a wonderful Christmas. (Doc. No. 62 at ¶ 30; Doc. No. 56, Ex. J.)

Merritt responded to the email the next day: "I do wish to terminate my Management Agreement. We will work in partnership to abide by Section 2 in the Agreement. We can

coordinate through Peter Webb as payments come due. Thank you again for everything that you've done for us." (Doc. No. 62 at ¶ 31; Doc. No. 56, Ex. K.)

The Court finds Plaintiff has not met his burden to show that the parties mutually intended to create a novation consisting only of Section 2 of the agreement. The intention of the parties is not clear from this email exchange. While Bullington stated Merritt's only obligations under the Agreement would be those in Section 2, he did not clearly state an intent to void the agreement and create a new one. To the contrary, Bullington may be confirming that even though the Agreement will terminate early, Merritt must abide by the terms of the Agreement and pay commission on the work done by 1 Degree.

Because questions of fact exist regarding the parties' intention to create a novation, Plaintiff's motion for summary judgment is DENIED.[4]

### E. Other Claims

Although Defendants ask the Court to dismiss Plaintiff's Amended Complaint in its entirety, their motion for summary judgment only addresses Plaintiff's allegation that Defendant 1 Degree committed the first material breach. Defendants do not address the other bases on which Plaintiff requests a declaratory judgment – that the Agreement provisions creating perpetual payment obligations are void or unenforceable and that 1 Degree waived its right to payment on the World Fuel agreement. Nor do Defendants present evidence or argument in support of their counterclaims for unjust enrichment, punitive damages, or attorneys' fees. In a motion for summary judgment the burden is on the movant to inform the

---

[4] Plaintiff's motion for partial summary judgment moved for summary judgment only on the issue of attorneys' fees.

court of the basis for its motion and identify specific portions of the record in support of its motion. In reviewing the motions for summary judgment, the Court has only considered the arguments directly presented. Accordingly, Defendants' Motion for Summary Judgment on the remaining claims is DENIED.

## IV. CONCLUSION

For the reasons stated, Defendants' Motion for Summary Judgment is DENIED and Plaintiff's Motion for Summary Judgment is DENIED.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE