IN UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| TROY MERRITT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | NO. 3:17-cv-01372 |
| v. ) | |
| ) | JUDGE CAMPBELL |
| ) | MAGISTRATE JUDGE |
| ) | NEWBERN |
| MGC SPORTS LLC and 1 DEGREE ) | |
| SPORTS MANAGEMENT, LLC., ) | |
| ) | |
| Defendant. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to Fed. R. Civ. P. 52(a)(1), the Court makes the following findings of fact and conclusions of law.

**I. INTRODUCTION**

Plaintiff Troy Merritt brings this action against Defendants, MGC Sports LLC ("MCG Sports") and 1 Degree Sports Management ("1 Degree") seeking declaratory relief under 28 U.S.C. § 2202 as to his obligations under a sports management agreement ("Agreement") with 1 Degree Sports.[1] Specifically, Plaintiff asks the Court to declare that: (1) MGC Sports cannot enforce the compensation terms of the Agreement because it is not a party to the Agreement; (2) Plaintiff is excused from performance under the Agreement due to 1 Degree's material breach of the contract when it improperly assigned the Agreement to MGC Sports without written consent; (3) that any assignment of the contract is null and void; (4) that Plaintiff's payment obligations

---

[1] For ease of reference, the Court refers to Mr. Merritt as Plaintiff and 1 Degree and MGC Sports as Defendants throughout.

1

under the Agreement are limited to the term of the Agreement; (5) that any perpetual compensation obligations in the Agreement are voidable or unenforceable; and (6) that Plaintiff is not obligated to pay commission to MGC Sports or 1 Degree on the corporate endorsement contract with World Fuel Services. In response, Defendants filed a counterclaim, asserting claims for breach of contract and quantum meruit/unjust enrichment for failure to pay commissions owed under the Agreement. Defendants seek payment of amounts due under the Agreement, punitive damages, and attorneys' fees.

The Case was tried without a jury on February 25-26, 2020. The parties submitted proposed findings of fact and conclusions of law.[2] (Doc. Nos. 120, 121).

## II. FINDINGS OF FACT

Plaintiff Troy Merritt is a professional golfer. On November 25, 2014, Plaintiff signed a marketing representation agreement (the "Agreement") with 1 Degree Sport Management, LLC, the agency where his long-time agent, Peter Webb, was then employed. (Def. Ex. 1; Trial Tr., vol. I, 27).

Under the Agreement, Plaintiff retained 1 Degree, which was owned by Alan Bullington, as his "Manager and Agent" to serve as his "exclusive representative worldwide in negotiating and managing [] income-producing activities on [his] behalf." (Def. Ex. 1). These income-producing activities included "product endorsements, exhibitions, outings, clinics, television appearances, speaking engagements, resort or club affiliations, foreign or special tournament appearances, and various other opportunities." (*Id.*). The Agreement further provided, in relevant part:

---

[2] The trial transcript is electronically filed at Doc. No. 117 (vol. I, Feb. 25, 2020) and Doc. No. 118 (Vol. II, Feb. 26, 2020).

2

2. <u>Compensation</u>

> 2.1 As compensation for the services provided by 1 DEGREE pursuant to the terms of this Agreement (the "Services"), you agree to pay 1 DEGREE twelve percent (12%) of all your gross income actually received from golf equipment endorsement or usage contracts, specifically contracts relating to golf clubs, golf balls, golf shoes or golf gloves, negotiated (in full or in part), secured (in full or in part) or managed (in full or in part) on your behalf by 1 DEGREE. 1 DEGREE will be entitled to receive the compensation identified in this paragraph 2.1 for the contractual term of any golf equipment endorsement or usage contracts negotiated, secured or managed on your behalf by 1 DEGREE.
>
> 2.2 You also agree to pay 1 DEGREE twenty percent (20%) of any appearance fee or prize money (whichever is greater) you receive as a result of competing, as the recipient of a sponsor or special exemption, in an Unofficial Event or an Official Event on a tour in which you are not a member. . . . You agree that your obligations set forth in this paragraph 2.2 apply even if the event occurs after the termination of this Agreement. . . .
>
> 2.3 You also agree to pay 1 DEGREE twenty percent (20%) of all your gross income actually received from any other income-producing opportunities (i.e. corporate endorsement contracts) negotiated (in full or in part), secured (in full or in part) or managed (in full or in part) on your behalf by 1 DEGREE. 1 DEGREE will be entitled to receive the compensation identified in this paragraph 2.4 for the contractual term of such income-producing opportunities negotiated (in full or in part), secured (in full or in part) or managed (in full or in part) on your behalf by 1 DEGREE. All renewals or extensions of any income-producing opportunities initially negotiated (in full or in part), secured (in full or in part) or managed (in full or in part) on your behalf by 1 DEGREE but renewed or renegotiated on your behalf by a third-party after effective termination of this Agreement shall be subject to a perpetual fifteen percent (15%) commission payable to 1 DEGREE. For avoidance of doubt, the preceding sentence applies even if the renegotiated terms differ from the original terms negotiated by 1 Degree.

> 2.4 You agree to pay all amounts owed to 1 DEGREE under the terms of this Agreement no later than fifteen (15) days following receipt by you of the commissionable income.
>
> 3. Term
>
> 3.1 This Agreement shall be effective as of the Date of Execution established below and shall continue until December 31, 2017 (the "Termination Date"). The Agreement will then automatically renew and be extended for additional periods of two (2) years unless one party notifies the other in writing at least thirty (30) days prior to the then existing termination date of its desire not to renew the Agreement.
>
> 4. Miscellaneous
>
> 4.1 . . . . The prevailing party in any dispute relating to this Agreement shall also be entitled to reimbursement of all attorneys fees and court costs.
>
> 4.2 This 3-page Agreement constitutes the final, complete and exclusive agreement between the parties pertaining to the subject matter herein, and supersedes all prior agreements. Any changes or supplements to this Agreement must be in writing and signed by both parties.
>
> . . . .
>
> 4.6 This agreement cannot be assigned without prior written consent of both parties.

(*Id.*). Although Plaintiff had a distinct preference to continue working with his long-time agent, Peter Webb, the Agreement does not mention Webb or refer specifically to any individual agent. (Trial Tr., vol. I, 78-79, 98-99, 143-45). Plaintiff testified that he would not have signed with 1 Degree if not for his relationship with Webb, but admitted that he signed the Agreement with 1 Degree and that anyone at 1 Degree could work on his representation. (*Id.*).

In 2016, Bullington decided to form a new sports agency with the law firm MGC Law, LLC. (*Id.*, 189-90). Pursuant to an agreement between the companies, 1 Degree and MGC Law

formed MGC Sports. Each company owned approximately 50% of the newly formed sports agency.[3] (*Id*. at 175, Def. Ex. 8).

The newly created company, MGC Sports, took over operations from 1 Degree on November 1, 2016. (Trial Tr., vol. I, 193-94). The existing 1 Degree employees moved into MGC Law's Nashville office, MGC Sports began processing the payroll for 1 Degree employees, and 1 Degree's email and website were changed to MGC Sports. (*Id*., 192-94; Trial Tr., vol. II, 20-22). The 1 Degree employees, except for Webb, executed ratification agreements to become employees of MGC Sports. (Trial Tr., vol. I, 47-49, 71). MGC Sports planned to handle all representation, including the representation of former MGC Law football clients, 1 Degree football clients, and 1 Degree golf clients. (*Id*., 186). Webb testified that his understanding was that "1 Degree Sports was going to be no longer, and MGC Sports was now taking over, and we would all be employees of MGC." (*Id*., 40).

After some period of indecision and unsuccessful attempts to negotiate an independent contract with MGC Sports, on December 9, 2016, Peter Webb resigned. (*Id*., 46-47). Webb continued working point on Plaintiff's "income-producing activities" from November 1, 2016 to December 9, 2016, but did not generate any new opportunities during this period. (*Id*., 150).

Plaintiff testified that he considered staying with MGC Sports after Webb's departure. On December 14, 2016, he had a phone call with Bullington and two of the MGC Sports agents (formerly 1 Degree agents). (*Id*., 158-61). During the phone call, Plaintiff asked Bullington to release him from his representation agreement, which was not set to expire until December 31, 2017. Bullington agreed to release Plaintiff from the Agreement effective December 31, 2016. (*Id*., 134, 223; Trial Tr., vol. II, 59). The two agreed to confirm their agreement in writing. (Trial

---

[3] MGC Law owns 50.001 percent and 1 Degree owns 49.999 percent. (Def. Ex. 8 at 41).

5

Tr., vol. I, 131; Trial Tr., vol. II, 25). Bullington described the phone conversation that led to Merritt's early release from the Agreement as "professional and cordial." (Trial Tr., vol. I, 210).

> Following the telephone conversation, Bullington sent an email to Plaintiff stating:
>
> Per our conversation earlier this morning I am writing to confirm that you would like to terminate your management agreement dated November 23, 2014 ("the Agreement"). While the Agreement is not set to expire until December 31, 2017, I will agree to an effective termination date of December 31, 2016. Above all else, I want you and Courtney to be comfortable with your management situation. I know you and your family have been through an extraordinarily difficult situation with your uncle, and we definitely don't want to cause you or Courtney any additional stress. Your only post termination obligations will be those set forth in Section 2 of the Agreement, and I'm happy to coordinate fulfillment of those obligations with you, Courtney or Peter as payments become due. Just let me know who you would like me to communicate with moving forward. I wish you the best of luck on and off the course and hope your family has a wonderful Christmas.

(Def. Ex. 10). Plaintiff responded to the email the next day, stating: "I do wish to terminate my Management Agreement. We will work in partnership to abide by Section 2 in the Agreement. We can coordinate through Peter Webb as payments come due. Thank you again for everything that you've done for us." (*Id.*).

The parties did not specifically discuss the provision for attorneys' fees. Bullington testified that did not intend to void the attorneys' fees provision when he agreed to release Plaintiff from the Agreement early. (Trial Tr., vol II, 11-12, 26). He noted that, at the time he agreed to early termination, there was no dispute between the parties. (*Id.*).

In January and April 2017, MGC Sports sent Merritt invoices for commissions earned in 2016 and the first quarter of 2017. (Pl. Exs. 3, 4). Plaintiff testified that, although he thought it was odd that he received an invoice from MGC Sports because he did not have a contract with MGC Sports, he paid the invoices. (Trial Tr., vol. I, 125-27). On October 10, 2017, MGC Sports sent an invoice for a much larger sum, reflecting amounts allegedly owed for additional income

earned in 2017 from 1 Degree secured opportunities. (Pl. Ex. 5). Plaintiff testified that he did not pay this invoice because he did not have a contract with MGC Sports. (Trial Tr., vol. I, 129). Plaintiff initiated this case a few days later on October 13, 2017. (*See* Doc. No. 1). After he filed his Complaint on October 13, 2017, 1 Degree sent Merritt an invoice, dated November 10, 2017, for the same amounts contained in the October 10, 2017 MGC Sports invoice. (Pl. Ex. 6).

1 Degree secured "income producing opportunities" for Merritt from a number of companies. For the most part, the parties agree that if Merritt is obligated to pay commission to 1 Degree / MGC Sports, the amounts owed are determined based on the calculation of the percentage of commission owed and the amount paid to Plaintiff as a result of the opportunity. However, Plaintiff claims to owe, if anything, less than the full commission on three contracts: Wilson Sporting Goods, MGM Resorts International, and World Fuel.

### III. CONCLUSIONS OF LAW

Merritt acknowledges that if MGC Sports had not taken over operations for 1 Degree and 1 Degree had continued operating as his sports agency, he would owe 1 Degree the commissions. (Doc. No. 121 at 22). He claims, however, that 1 Degree assigned its duties under the agreement to MGC Sports without his consent and that this constituted a material breach of the Agreement that excuses his performance – *i.e*., his obligation to pay. Defendants argue that 1 Degree did not assign any duties under the Agreement and that even if assignment of duties occurred, it did not constitute a material breach that would excuse Merritt from paying for services rendered prior to the assignment.

If the Court determines that he must pay commissions for the income producing opportunities secured by 1 Degree, Plaintiff argues certain commissions should be reduced to reflect split commission agreements and/or caddy payments. In addition, Plaintiff argues the

7

Court should not enforce the provision of section 2.3 of the Agreement that requires payment of a "perpetual fifteen percent commission" or the attorneys' fees and costs provision in section 4.1.

Defendants assert that Merritt breached the Agreement by not paying commissions owed and contend that they are entitled to an award of damages based on the value of commissions owed under the Agreement for income producing opportunities secured by 1 Degree.

**A. Breach of Contract**

"The essential elements of any breach of contract claim include (1) the existence of an enforceable contract, (2) nonperformance amounting to a breach of the contract, and (3) damages caused by the breach of the contract."[4] *Arc LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005) (internal citation and quotations omitted). "When one party to a contract materially breaches the same, is unable to perform, or manifests an intention to no longer be bound by the contract, the non-breaching party is excused from further performance." *Markow v. Pollock*, No. M2008-01720-COA-R3-CV, 2009 WL 4980264, at *5 (Tenn. Ct. App. Dec. 22, 2009). "A party who has materially breached a contract is not entitled to damages stemming from the other party's later material breach of the same contract." *McClain v. Kimbrough Const. Co.*, 806 S.W.2d 194, 199 (Tenn. Ct. App. 1990). If a breach of contract "was slight or minor, as opposed to material or substantial, the nonbreaching party is not relieved of his or her duty of performance, although he or she may recover damages for the breach." *M & M Elec. Contractor, Inc. v. Cumberland Elec. Membership Corp.*, 529 S.W.3d 413, 423 (Tenn. Ct. App. 2016) (citations and quotation marks omitted).

---

[4] The parties agree that Tennessee law governs in this action.

Whether a breach is material requires consideration of the following factors:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*McClain*, 806 S.W.2d at 199 (citing Restatement (Second) of Contracts § 241 (1979)).

Plaintiff asserts that, on November 1, 2017, when 1 Degree ceased operations and MGC Sports took over operations, 1 Degree assigned its performance obligation under the contract to MGC Sports. Plaintiff reasons that if 1 Degree, which ceased operations by November 1, 2016, did not assign the Agreement, the "marketing representation" obligations of the Agreement would have gone unfulfilled. Plaintiff argues that the assignment breached the non-assignment clause of the Agreement, which provided that the Agreement could not "be assigned without prior written consent of both parties."[5]

The Court need not determine whether 1 Degree assigned Plaintiff's representation agreement to MGC Sports because, even if 1 Degree did improperly assign the Agreement, an assignment under these circumstances does not constitute a *material* breach such that Plaintiff is

---

[5] In considering the parties' motions for summary judgment, the Court held that assignment of the right to payment did not breach the Agreement. (Doc. No. 82 at 8).

9

relieved of his payment obligations under the Agreement. Plaintiff obtained the benefit he reasonably expected from the Agreement. Plaintiff testified that he had no complaints about the service he was provided by 1 Degree in securing the income producing opportunities for which Defendants seek commission. (Trial Tr., vol. I, 145-46). All of the "income producing opportunities" for which Defendants seek compensation were secured before November 1, 2017, while 1 Degree was still operating as a sports management agency. Even if MGC employees began working on Plaintiff's behalf beginning November 1, 2016, they were the same people who had been working on his representation through 1 Degree. As Defendants put it, "[T]he only that changed on November 1, 2016, was the name on the letterhead. The exact same people and no others were providing the exact same service for Merritt without any objection or complaint from him…" Moreover, any potential injury to Plaintiff by virtue of the assignment was mitigated by Defendants' agreement to terminate the Agreement early.

Plaintiff argues that Defendants' inability to cure the breach and lack of good faith and fair dealing weigh in favor of finding a material breach. The Court disagrees. There is no evidence of lack of good faith on the part of Defendants. In fact, Plaintiff testified that he considered "staying put" and listened to a pitch from MGC Sports. (Trial Tr., vol. 1, 133, 161). The inability to cure in the manner suggested by Plaintiff has no application to the circumstances of the alleged breach. In any event, the ability to cure became moot when the parties agreed to early termination of the Agreement.

Based upon these facts, Plaintiff fails to show he was deprived of any benefit he reasonably expected under the Agreement or that he has been injured by any assignment that may have occurred. Accordingly, the Court finds Plaintiff has not shown Degree materially breached the Agreement.

10

Case 3:17-cv-01372   Document 122   Filed 10/06/20   Page 10 of 18 PageID #: 1658

**B. Novation**

Plaintiff argues that the December 14-15, 2016 telephone conversation and subsequent email exchange between Plaintiff and Bullington, constituted a novation consisting only of Section 2, and that the attorneys' fees provision in Section 4 is not part of this new agreement.[6]

A novation is a contract substituting a new obligation for an old one, thereby extinguishing the existing contract. *Lowe v. Smith*, 2016 WL 5210874 *7-8 (Tenn. Ct. App. 2016). "The four essential elements of a novation are: '(1) a prior valid obligation, (2) an agreement supported by evidence of intention, (3) the extinguishment of the old contract, and (4) a valid new contract.'" *TWB Architects, Inc. v. Braxton, LLC*, No. M2013-02740-COA-R3CV, 2014 WL 5502401, at *4 (Tenn. Ct. App. Oct. 30, 2014) (citations omitted). "'[A] novation differs from a modification of a contract since a modification alters only certain portions of the contract, and leaves the original contract in place, while a novation substitutes a new contract and wholly extinguishes the earlier contract.'" *Williams v. Hirsch*, 2018 WL 2383612, at *6 (Tenn. Ct. App. 2018) (quoting 58 AM. JUR. 2D Novation § 2, Westlaw (database updated May 2018)). The party asserting novation has the burden of proving that all parties had a clear and definite intent to replace the old contract with the new one. *Williams*, 2018 WL 2383612, at *5. Where there is conflicting evidence, the parties' intent on a possible novation is a question of fact. *Lowe*, 2016 WL 5210874 at *7 (citing 21 Steven W. Feldman, *Contract Law and Practice* § 3:43). "Evidence of the parties' intent may be shown through an express agreement or by subsequent conduct." *Williams*, 2018 WL 2383612, at *6.

---

[6] Section 4.1 of the Agreement provides in relevant part, "The prevailing party in any dispute relating to this Agreement shall also be entitled to reimbursement of all attorneys fees and court costs."

11

On December 14, 2016, during a phone call with Bullington and two other agents, Plaintiff asked to be released from his representation agreement. Bullington agreed to terminate the Agreement effective December 31, 2016, subject to Plaintiff's post-termination payment obligations in Section 2 of the Agreement. Following the telephone conversation, Bullington sent an email to Plaintiff confirming their conversation. He wrote, "Per our conversation earlier this morning I am writing to confirm that you would like to terminate your management agreement dated November 23, 2014 ("the Agreement"). While the Agreement is not set to expire until December 31, 2017, I will agree to an effective termination date of December 31, 2016. …Your only post termination obligations will be those set forth in Section 2 of the Agreement…" (Def. Ex. 10).

Plaintiff argues that Bullington's use of the "conspicuous" modifier "only" supports Merritt's position that the agreement constituted a novation which did not include the attorneys' fees provision. (Doc. No. 30 at 121).

At trial, Bullington testified that this was not his intent. He stated:

> I know opposing counsel has argued that my email exchange with Mr. Merritt in December of '16 somehow relieved Mr. Merritt of [the attorneys fees] obligation if …the Court was to award us damages. However, that was simply not my intent at the time. At the time I wrote that email and chose those words, there was no dispute between 1 Degree and/or MGC Sports and Mr. Merritt. So at the time I wrote that email, his only post-termination payment obligations were those set forth in Section 2 of the representation agreement.

(Trial Tr., vol. II, 11-12).

The Court finds no reason to conclude that Bullington's email about Plaintiff's post-termination obligations intended to create a new agreement. Nor does Plaintiff's request to terminate the Agreement before the contractual end date bear any indication that he sought a new

agreement. The Court finds that the parties intended only to modify the termination date from December 31, 2017, to December 31, 2016.

Accordingly, there is no novation. The parties agreed to a modified termination date and all provisions of the Agreement, including the provision for attorneys' fees, remained in effect.

## C. Perpetual Commissions

On summary judgment, Plaintiff argued that the provision of the Agreement that requires a "perpetual commission" on certain income producing opportunities initially negotiated, secured, or managed by 1 Degree is an unenforceable perpetual obligation. The Court held that, despite the language in the Agreement, the commission obligation is not actually perpetual. (Doc. No. 82 at 9-10). The Court previously explained, "[T]he commission is not payable indefinitely, but only for so long as the 'income producing opportunities' originally negotiated by 1 Degree are renewed. When Merritt chooses not to renew these opportunities and no longer receives the associated income, the payment obligation will end." (*Id*. at 10).

Plaintiff now seeks to revisit this issue and argues that the Court must look at the December 15, 2016, novation to determine whether the parties intended to create a perpetual obligation. Plaintiff argues, "the novation does not contain the requisite clear expression of a perpetual obligation, and as a result, neither 1 Degree or MGC Sports are entitled to receive commissions from Merritt after December 31, 2018 for any agreements of any kind or any nature." (Doc. No. 121 at 32).

As stated above, the parties did not create a novation. Moreover, the Court previously determined that the commission arrangement is not a perpetual obligation. The Court does not now reach a different conclusion.

13

Accordingly, the obligation to pay commission to Defendants for income producing opportunities negotiated, secured, or managed by 1 Degree is enforceable and Plaintiff is obligated to pay commission to Defendants on this income as provided in the Agreement.

**D. Damages**

The Court finds that Defendants are entitled to receive commissions due under the agreement. By Plaintiff's calculation, commissions due under the Agreement amount to $95,925 after certain set-offs and credits. (Doc. No. 121 at 35). Defendants dispute the set-offs and credits and calculate that, based on the terms of the Agreement, Plaintiff owes $152,487.00. (Doc. No. 120 at 27).[7] To reach an accurate determination, Defendants shall file a Statement of Damages, the contents of which will be discussed below.

The Court will first consider Plaintiffs' entitlement to set-offs and credits, which Plaintiff claims should apply to the following contracts: (1) Wilson Sporting Goods; (2) MGM; (3) World Fuel.

    1.    <u>Wilson Sporting Goods</u>

Plaintiff argues he is entitled to a set-off for amounts paid to his caddy – $15,000 in 2017, and $10,000 in 2018. The contract with Wilson Sporting Goods Co. ("Wilson") provided Plaintiff would use certain Wilson equipment, and wear the Wilson logo on specified apparel. (Pl. Ex. 14). The agreement also stated, "Endorser's caddy shall also wear such a hat [bearing the Wilson Staff logo]" along with Plaintiff at all professional tournaments in which Plaintiff was competing. (*Id*.). Although the contract did not specify any compensation for Plaintiff's caddy, Plaintiff testified that "it was understood" that $15,000 would be set aside for the payment of his

---

[7]     Defendants apparently abandoned their claim for punitive damages.

14

caddy in 2017 and $10,000 would be set aside for his caddy in 2018. (Trial Tr., vol. I, 112-13). Plaintiff explained that this arrangement allowed Wilson to avoid a direct contract with the caddy which was beneficial if Plaintiff changed caddies during the season. (Pl. Ex. 14; Trial Tr., vol. I., 112-13). When asked if he disputed that "a portion of Wilson 2017 was for Mr. Merritt's caddy," Bullington responded, "I dispute that the contract requires him to pay any amount to his caddy." (Trial Tr., vol. II, 34). Bullington further testified that it was not customary for an equipment agreement to require the caddy to wear the brand and that caddies are free to get their own sponsorship deals. (*Id.*).

The Court finds that because the Wilson contract did not require Plaintiff to pay a portion of his compensation to his caddy, that amount should not be deducted from his compensation for purposes of calculating commission due under the Agreement.

    2.    <u>MGM Resorts International</u>

Merritt had an endorsement contract with MGM Resorts International Operations, Inc. ("MGM") for the year 2017. The parties agree the MGM contract is subject to a 20% commission on the cash compensation. Defendants do not seek commission on the compensation that was in the form of resort credit. The MGM contract included a commission split whereby Octagon Inc. would receive a 7.5% commission paid directly to Octagon by MGM. The contract provided, in part, the following:

> Professional agrees to deduct $3,750.00 (which is the 7.5% commission split) from total base compensation above [$50,000]. This will be paid directly to Octagon Inc. by Client instead of directly to Professional. Such commission shall be paid per the following structure . . .:
>
>     a) $1,875.00 in cash; and
>     b) $1,875.00 in resort credit . . .

15

> Such commission amounts will be withheld rateably by Client as each installment of base compensation is made to Professional.

(Pl. Ex. 11 at 14).

Plaintiff's cash compensation in 2017 was $25,000. Plaintiff argues the 7.5% commission payment to Octagon ($1,875) amount should be deducted from the 20% commission ($5,000) owed to 1 Degree, resulting in a commission of $3,125. Defendants argue that because the Octagon payment is deducted by MGM, Plaintiff actually received $23,125 and they should receive a 20% commission on that amount, which results in a commission of $4,625.

Defendants' proposed calculation is inconsistent with their prior actions under the contract. Defendants originally invoiced Plaintiff for $3,125 (12.5% of $25,000). (*See* Pl. Ex. 5 and 6). Accordingly, the Court concludes that Plaintiff owes Defendants $3,125 on the 2017 MGM contract. The same method of calculation shall be used to determine any amounts owed for subsequent contracts.

    3.    <u>World Fuel</u>

The World Fuel contract was also subject to a fee split arrangement. The parties agree the World Fuel contract is subject to a 20% commission to 1 Degree. Webb orally agreed that Plaintiff would pay 10% commission to two other agencies – GA Sports and Winspire. (Trial Tr., vol. I, 54, 85). Plaintiff renewed the World Fuel endorsement contract for 2018, 2019, and 2020. The renewals were subject the same commission split. (*Id.*, 54-55, 122).

Plaintiff claims Bullington agreed to forego commission on the 2017 World Fuel contact because Merritt was already paying 20% to the other agencies. (Doc. No. 121 at 20). In 2017, after MGC Sports invoiced Plaintiff for the full 20% commission on the World Fuel contract, Webb and Bullington exchanged emails regarding the amount Plaintiff should owe after the fee

split. In the email Webb reminded Bullington that they had "3 different conversations about the fee split." (Def. Ex. 12). It is not clear from the email whether the final details of the fee arrangement were discussed. Webb proposed that Plaintiff pay "10% of the $56k (which is $70k less 20% agency fees for [the other agencies]) from the World Fuel deal." (*Id.*). Bullington responded, "I do recall discussing World Fuel, but I do not recall agreeing to 100% of the commission going to [the other agencies]. That being said, I cannot definitively state that is did not verbally sign off on that arrangement for year 1." (*Id.*). Bullington wrote that he did not want Plaintiff to pay more than 20% commission and that he would not begin to invoice him until 2018. (*Id.*). However, he changed his mind about not seeking commission for 2017 when Plaintiff filed this case. (Trial Tr., vol. I, 212).

It appears from the email and the testimony that the parties cannot recall exactly what they agreed regarding the unwritten commission split with GA Sports and Winspire. Based on the evidence in the record, particularly the fact that Bullington could not definitively say that he did not agree to the full first year commission going to the other agencies and he later agreed to this arrangement, the Court finds that Plaintiff should not pay commission to 1 Degree for the 2017 World Fuel contract. However, although it appears that Plaintiff has paid some amount to the other agencies in subsequent years, there is no evidence that 1 Degree agreed to waive commission beyond 2017. Accordingly, the Defendant should calculate commission owed on the World Fuel contracts beginning in 2018.

## IV. CONCLUSION

For the reasons stated, the Court concludes that (1) 1 Degree did not materially breach the Agreement and therefore Plaintiff is not excused from performance under the Agreement; (2) Section 2.3 of the Agreement does not create a "perpetual" obligation; (3) the parties did not create a novation; and (4) attorneys' fees may be awarded to the prevailing party pursuant to Section 4.1 of the Agreement.

Accordingly, Plaintiff is liable to Defendants for commissions owned pursuant to the Agreement and is entitled to an award of attorneys' fees.

An appropriate Order shall enter.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE